UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JORGE CALDERON,<br><br>  Plaintiff,<br><br>v.<br><br>FEDEX EXPRESS CORPORATION, and JOHN DOES 1-10, JANE DOES 1-10, ABC CORPORATIONS (FICTITIOUS CORPORATIONS 1-10),<br><br>  Defendants. | Civil Action No.:<br>2:17-cv-01608-WJM-JSA<br><br>OPINION |

**WILLIAM J. MARTINI, U.S.D.J.:**

This matter arises out of the termination of Plaintiff Jorge Calderon's ("Plaintiff") employment with Federal Express Corporation ("Defendant" or "FedEx") following Plaintiff's failure to report damage to a trailer allegedly caused by Plaintiff in the performance of his employment duties. Before the Court is Defendant's motion for summary judgment (the "Motion") pursuant to Federal Rule of Civil Procedure 56. ECF No. 65. For the reasons set forth below, Defendant's Motion is **DENIED**.

**I.   BACKGROUND**[1]

Plaintiff is a Cuban American and former employee of FedEx who began his career with the company as a part-time cargo handler in 1986. Def. SOMF ¶ 1. In September 1988, Plaintiff accepted a full-time position as a ramp transport driver at FedEx's Newark Liberty International Airport ("EWR") station, a position he held until his employment was terminated by Defendant on April 6, 2016. *Id.* at ¶ 3. In his position as a ramp transport driver, Plaintiff was responsible for, among other things, moving tractor trailers from one location to another and staging them in the yard. *Id.* at ¶ 5. During his employment, Plaintiff earned a twenty-five-year safe driving award for his work performance. Pl. Dep. 224:2-6. Prior to this alleged incident, Plaintiff maintained a perfect record for handling company property. Calderon. Aff. ¶ 7. At the time of his termination, Plaintiff regularly worked the morning shift from approximately 1:30 a.m. EST through 12:30 p.m. EST. Pl. Dep. 69:25 – 70:8.

---

[1] To the extent that certain facts are agreed upon by the parties and therefore undisputed, the Court cites to Defendant's Statement of Material Facts ("Def. SOMF") in support of its Motion. With respect to facts that appear to remain in dispute, the Court shall cite directly to the underlying record.

### A.      Plaintiff's Workplace Issues and Complaints

Throughout his employment with FedEx, Plaintiff alleges that he experienced a hostile work environment, disparate treatment, and retaliation. In particular, Plaintiff alleges that certain non-management employees, including John Calamari, who was also a tractor trailer driver until his retirement in 2013, and Tom Gatti, a tractor trailer driving instructor who trained Plaintiff in 1988 and would appear on occasion at the EWR station during Plaintiff's shifts, would routinely direct racial slurs and epithets towards Plaintiff while at work. Pl. Dep. 137:4 – 138:15, 141:17 – 144:25; Def. SOMF ¶¶ 60-62. Plaintiff never reported these incidents to FedEx management and claims he failed to do so out of fear. Pl. Dep. 145:1 – 146:8; Def. SOMF ¶ 63. Plaintiff also states that, at some point in 2008, he was "aggressively interrogated" by members of FedEx's security team concerning an "irregularity . . . concerning wooden skids" at a FedEx facility. Calderon Aff. ¶ 18.

In addition, Plaintiff alleges he had numerous issues with certain members of management. Specifically, Plaintiff alleges several disputes or unpleasant conversations with Mike Scerbo, his senior manager. In essence, Plaintiff claims that Scerbo would inaccurately tell Plaintiff that he would not be paid for days off due to inclement weather or declared states of emergency, that Plaintiff would call a special hotline to FedEx headquarters in Memphis, Tennessee to confirm the accuracy (or inaccuracy) of Scerbo's comments, and that Scerbo, upon discovering Plaintiff's calls to headquarters, would then angrily confront him at work in the drop yard at night. Pl. Dep. 178:23 – 1841:5. On another occasion, this time in 2006, Plaintiff took issue with a certain work assignment given to him by his managers that required him to clean out trailers. Pl. Dep. 169:18 – 171:22. However, upon reporting his concern at being singled out for this task to FedEx headquarters, officials with the company decided to rotate responsibility for cleaning out the trailers among various employees. Pl. Dep. 176:21 – 178:17.

In October 2015, Plaintiff also was a complainant in a workplace violence incident stemming from comments made by a co-worker, Kwasi Asante, during a meeting involving ramp transport drivers, including Plaintiff, and their direct manager, Tom Loch. Def. SOMF ¶¶ 24-25. During this meeting, Asante allegedly stated something to the effect of "the [senior manager] should pick a location where all parties could sign a waiver and 'go at it,'" which Plaintiff interpreted as a direct threat to himself. *Id.* at ¶ 27. At Plaintiff's request, Loch filed a workplace violence report with FedEx security, which was investigated through, among other things, interviews with each of the meeting's attendees. *Id.* at ¶ 28. During this investigation, Asante denied making any threats and claimed that he was merely suggesting group gym sessions to build teamwork, and several other attendees stated that they recalled a reference to gyms but denied hearing anything that seemed like a threat to themselves or Plaintiff. *Id.* at ¶¶ 29-31. Loch further noted during his own interview that he immediately stopped Asante from continuing with his remarks. (*Id.* at ¶ 32). Asante received documented counseling for his conduct, and, on November 13, 2015, Plaintiff received a letter from Scerbo stating that his complaint had been investigated and the issues raised therein had been addressed. *Id.* at ¶ 34. Plaintiff, however, disagreed that his concerns had been adequately addressed, and requested further

2

information. *Id.* at ¶ 35. Following a conference call between management, security, and human resources, FedEx's managing director Brian Hughes and HR advisor Sharon Middleton met with both Plaintiff and Asante individually to discuss their ability to work together without conflict. *Id.* at ¶ 38.

Plaintiff also claims there were a variety of other slights and workplace issues that he alleges were discriminatory. For example, Plaintiff, after being designated a "coordinator," complained to FedEx headquarters that the position was merely a title change with some added responsibility and not a promotion with a corresponding pay increase. Pl. Dep. 174:16 – 176:6. Plaintiff raised further complaints about the poor work habits of, and the lack of support provided by, management and certain of his coworkers who worked in other locations. Pl. Dep. 42:2 – 8, 201:4 – 202:1, 202:25 – 205:6. Plaintiff also stated that, unlike other employees, he did not receive a celebration for his 25th anniversary with FedEx until his 29th year of employment with Defendant. Pl. Dep. 181:16 – 184:6. Finally, Plaintiff noted that at some point beginning around 2006 or 2007, management ceased paying certain "B.Z.s" to him for finding misplaced trailers. Pl. Dep. 184:14 – 186:24.

### B. Plaintiff's Accident and Subsequent Termination

At approximately 2:17 a.m. EST on March 29, 2016, Plaintiff staged FedEx trailer #162247 (the "Prime Trailer") in the airborne section of the yard at the EWR station. (Def. SOMF ¶ 39). About five minutes later, Plaintiff staged FedEx trailer #541789 (the "Swift Trailer") directly next to the Prime Trailer. *Id.* at ¶ 40. When doing so, Plaintiff did not feel or hear any contact or impact between the trailers. Plaintiff's Response to Defendant's Statement of Material Facts ¶ 40 ("Pl. RSOMF"). Plaintiff subsequently left work that morning at approximately 11:30 a.m. EST. Def. SOMF ¶ 41. Later that day, at approximately 12:20 p.m. EST., members of the afternoon shift noticed the front of the two trailers "about 4 to 5 inches apart" and the back of the two trailers "wedged together". Def. Reply Br., Ex. 1. One of the employees hooked one of the trailers to "[his] Ford mule, but [he] couldn't move them due to their close proximity." *Id.* That employee then requested assistance from Asante, one of the employees Plaintiff asserted a workplace violence report against, who then informed another employee referred to as "Dave." *Id.* On his second attempt, the employee, with the assistance of Dave, managed to move the trailer "about an inch." *Id.* Dave then managed to move the trailer himself about "half an inch." *Id.* Once they completed this maneuver and moved the Prime trailer, the employees noticed that "the trailer had a small scratch. However [he didn't] know if the trailers had an existing scratch." *Id.* The other employee noted that they "all did an inspection of the trailer and found that there were scratches from the hinges of the Swift Trailer." *Id.*

The next day, March 30, 2016, Loch approached Plaintiff and asked him if he was aware of the damage to the Prime Trailer. *Id.* at ¶ 43. Plaintiff indicated that he was surprised to learn about, and had no knowledge of, the damage to the Prime Trailer because he did not hear, feel, or otherwise notice any collision while positioning, and then repositioning, the trailers. Def. SOMF, Ex. 11, at 3; Pl. Dep. 92:15-20. On March 31, 2016,

3

Plaintiff was suspended with pay pending an investigation into the incident. Def. SOMF ¶ 49. Following its investigation, FedEx determined that Plaintiff was the last person to have operated both the Swift and Prime Trailers and that, therefore, he was responsible for the damage to the Prime Trailer. *Id.* at ¶ 50. As a result, on April 6, 2016, Plaintiff was informed that he was being terminated for failing to report an incident causing damage to a trailer as required by FedEx policy. *Id.* at ¶ 51.

Plaintiff appealed his suspension through FedEx's Guaranteed Fair Treatment Process ("GFTP"). *Id.* at ¶ 53. In a statement submitted by Plaintiff in support of his appeal, Plaintiff reiterated that he did not notice any damage and therefore did not intentionally fail to report such damage to management. Def. SOMF, Ex. 11, at 3. Though Plaintiff acknowledged that he could have inadvertently caused the damage, he also argued that the damage could have occurred prior to his moving the trailers, or by afternoon shift employees after he had left. *Id.* Following a meeting with management, senior management, and human resources, Plaintiff's termination was upheld. *Id.* at ¶ 54.

### C. Employee Handbook and Relevant FedEx Policies

Though Plaintiff did not have a written employment agreement between himself and FedEx, he did periodically acknowledge his receipt and understanding of FedEx's employee handbook. The employee handbook, among other things, contained a disclaimer which stated that it was not a contract of employment and that Plaintiff's employment remained at-will. Def. SOMF, Ex. 4, at 2.

In addition, FedEx maintained several policies that were applicable to workplace accidents or incidents. In particular, FedEx policy 2-5 titled "Acceptable Conduct" provided a non-exhaustive list of forms of misconduct which "may result in severe disciplinary action up to and including termination," including, "failure to report a vehicle accident or occurrence in accordance with [FedEx policy] 8-90 Vehicle Accidents/Occurrences and 4-48 Driving Qualifications." Def. SOMF, Ex. 5, at 1-2. The Acceptable Conduct policy also reiterated that the employment relationship between FedEx and its employees remained at-will, and that "the policies and procedures set forth in [the personnel manual] provide[d] guidelines for management and employees during employment, but [did] not create contractual rights regarding termination or otherwise." *Id.* at 9.

The Vehicle Accidents/Occurrences policy, in turn, sets forth the procedures for reporting and handling accidents or occurrences involving FedEx employees operating its vehicles. Def. SOMF, Ex. 6. In a section titled "Reporting Accidents/Occurrences – Employee Responsibility," the policy provides that "the operator of a road licensed vehicle . . . must report to a member of management or dispatch, if management is not available, any accident/occurrence of a vehicle coming in contact with an object, property, or person." *Id.* at 2. Towards the end of the policy, there is a section titled "Violations of Safety Regulations/Discipline," which further provides, in relevant part, that there are certain "serious violations of safety regulations for which an employee is immediately suspended with pay pending a complete Company investigation" and which, if confirmed, will "result

in severe disciplinary action up to and including termination." *Id.* at 4. Listed among these "serious violations" is the "[f]ailure to report an accident or occurrence immediately in accordance with this policy." *Id.* at 5.

In addition to these policies, on November 21, 2014, management at the EWR station forwarded an inter-office memorandum to all morning yard employees, including Plaintiff, setting forth job expectations. Def. SOMF, Ex. 3; Pl. Dep. 258:14-18. This memorandum specifically noted that "[a]ll accidents or incidents per policy must be reported immediately no matter how minor they may seem," and that "[f]ailure to report any accident can result in termination per policy." Def. SOMF, Ex. 3, at 2. Plaintiff further testified that while he was aware that failure to report an accident could lead to termination of his employment, he claims he could not have reported such an incident because he had no knowledge of it. Pl. Dep. 237: 20 – 238:7, 260:4-12.

### D. Other Alleged Accidents

Plaintiff claims that at least three other non-Hispanic employees were involved in multiple, serious accidents but were not terminated from their positions with FedEx. First, Plaintiff testified that he witnessed an accident in which an employee named Tony Pellegrini, while driving out of the drop yard, collided with part of the adjacent guard building and dented part of the trailer he was transporting. Pl. Dep. 102:1-8. Second, Plaintiff stated that another employee, Joseph Cisneros, was frequently involved in accidents, about which Plaintiff would learn over the radio from other, unidentified FedEx employees. Pl. Dep. 191:18 – 192:11. According to Plaintiff, Cisneros was involved in more than three such accidents within a year and, under FedEx policy, should have been, but was not, terminated as a result. Pl. Dep. 192:12-15. Finally, Plaintiff claims that after he had been terminated, he learned from his wife, who was also a FedEx employee, that a third employee named David Pellek was suspended for only four or five days for his involvement in a serious accident in which he injured a pedestrian, fled the scene, and was only caught upon review of security camera footage. Pl. Dep. 188:10 – 189:4, 190:1-7; Calderon Aff. ¶ 21.

## II. DISCUSSION

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Not every factual dispute will preclude summary judgment, and those concerning "irrelevant or unnecessary" facts will not factor into the Court's analysis. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Rather, "a fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Anderson*, 477 U.S. at 248). Similarly, a dispute with respect to a material fact is "genuine" if "a reasonable jury could return a verdict for the nonmoving party." *Id.* (quoting *Anderson*, 477 U.S. at 248).

The moving party bears the initial burden of establishing that no genuine issue of material fact remains for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence. . . that would entitle it to a directed verdict if not controverted at trial." *Id.* at 331. If, however, the burden of persuasion at trial would be on the nonmoving party, the movant may satisfy its burden by either: (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim"; or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id.* (citations omitted). Once the moving party meets this burden, the burden shifts to the non-moving party to "come forward with specific facts showing that there is a *genuine issue for trial* and do more than simply show that there is some metaphysical doubt as to the material facts." *United States v. Donovan*, 661 F.3d 174, 185 (3d Cir. 2011) (emphasis in original and internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986)). This requires the nonmoving party to present actual evidence that creates a genuine dispute for trial – reliance on unsupported assertions, speculation, or conclusory allegations is insufficient to defeat a properly supported motion for summary judgment. *Solomon v. Soc'y of Auto. Eng'rs*, 41 F. App'x 585, 586 (3d Cir. 2002) (citing *Celotex*, 477 U.S. at 324); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) (nonmoving party may not successfully oppose summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit.").

In deciding a motion for summary judgment, the Court "may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255). Put differently, the Court's sole task in deciding a motion for summary judgment is simply "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

Here, the Court is satisfied that there are several genuine issues of material facts and will therefore **DENY** Defendant's motion for summary judgment. Among other things, there exists genuine disputes regarding: (1) whether similarly situated non-Hispanic employees were treated more favorably in similar instances; (2) whether Tony Pellegrini, Joseph Cisneros, and David Pellek, who allegedly were involved in more serious incidents, were not terminated; (3) whether the scratches/damages to the trailers existed prior to Plaintiff's staging of them; (4) whether the employees who attempted to move the trailers caused the scratches/damages themselves; (5) whether Plaintiff was, or should have

6

reasonably been, aware of the scratches/damages to the Trailer; and (6) whether the scratches were of such a degree of damage to warrant termination under FedEx's policy.

### III.  CONCLUSION

For the reasons set forth above, Defendant's Motion for summary judgment is **DENIED**. An appropriate order follows.

/s/ William J. Martini
**WILLIAM J. MARTINI, U.S.D.J.**

**Date: November 3, 2022**